IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

MARIANNE WAYLAND,
  Plaintiff,

v.

OSF HEALTHCARE SYSTEM,
  Defendant.

Case No. 1:20-cv-01337-JEH

**Order**

  Now before the Court is Defendant OSF Healthcare System's Motion for Summary Judgment (Doc. 19).[1] The Motion is fully briefed, and for the reasons set forth below, the Defendant's Motion is GRANTED.[2]

**I**

  Plaintiff Marianne Wayland filed her Complaint (Doc. 1) against Defendant OSF Healthcare System (OSF) on September 30, 2020 alleging that OSF violated her rights under the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601 *et seq*. Specifically, she alleged that in late 2018 she applied for an intermittent leave of absence and a continuous leave of absence under the FMLA, utilized that time off, and the Defendant thereafter used it against her to impose a performance improvement plan and to ultimately terminate her employment on July 2, 2019. She seeks lost wages and benefits, an order mandating the Defendant's Board to remove any mention of discipline from her personnel records, liquidated

---

[1] Citations to the Docket in this case are abbreviated as "(Doc. ___)."
[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 13, 14).

damages, an award of attorney fees, and an order directing that she be reinstated to her former position of employment at OSF.

The undisputed facts are as follows. The Plaintiff, who began working for OSF in January 1999, became the Manager of OSF's Institute of Learning (IOL) in early 2016. The function of the IOL is to establish curriculum and train those who in turn train other OSF employees regarding technology solutions and how to use OSF software. The IOL also assists in bringing on new entities, new departments, new software, and maintaining training for those functions. Its responsibilities extend throughout OSF and its approximately 25,000 employees. The Plaintiff, as manager of the IOL, was responsible for implementing OSF's strategies and fostering innovation within the IOL and to her 30 direct reports. She oversaw both instructional designers and credential trainers. She was responsible for overseeing the training of other employees, departments, and hospital facilities in the use of OSF data management platforms and electronic patient information records, and she was responsible for creating education materials and transitioning from in-person learning to online learning. The Plaintiff was also responsible for meeting with leaders of other teams within OSF, including project management leaders and information technology leaders in order to understand how the IOL could meet their needs and service their departments. At any given time, there were hundreds of IT projects that IOL was involved in as well as internal IOL optimization and improvement projects. When the Plaintiff was hired as IOL's manager, the person to whom she reported called the Plaintiff "a visionary."

In 2016 or 2017, the Plaintiff began reporting to Brandy Fisher (Fisher), OSF's Vice President of Clinical Integration. Fisher executed the Plaintiff's employee evaluations in FY17 and FY18 who provided the Plaintiff with an overall rating of "solid." In August 2018, Wayland's employees participated in OSF's annual Mission Partner Opinion Survey (MPOS) through which departments are rated as

2

Tier 1, 2, or 3. Her own employees rated the IOL as Tier 3, which is the lowest rating a department can receive and which requires the manager to submit an action plan for improvement by the following January. There had been several previous years that the IOL department MPOS scored a Tier 3. The Plaintiff had multiple conversations with Fisher telling her that her team was very frustrated and angry about the volume of work that they were expected to complete and the fact that their workload kept increasing. Fisher's response was to tell the Plaintiff "we" have no choice in the matter and the projects had to be completed and that she needed to get creative and look at her department processes and get everybody working more efficiently and effectively. Following receipt of the low scores in August 2018, Human Resources Business Partner Sharon Bond (Bond) began meeting with each of the employees in the Plaintiff's department.

On September 19, 2018, OSF received a call to its Integrity Line. The Integrity Line is a phone number employees can call to make a complaint of some nature about anything that concerns them in the workplace, is managed by a third party, and complaints could be anonymous or can be identified. OSF's Integrity Line reports all bear the notation at the top of the form "ALLEGED FACTS ARE UNSUBSTANTIATED AND CONFIDENTIAL." (emphasis in original). The caller reported the Plaintiff and another employee at the IOL (whom Wayland supervised) had been bullying team members and that whenever a team member spoke out, had a difference of opinion, or tried to defend someone else, the team member was brought into the Plaintiff's office and disciplined.

In October or November 2018, the Plaintiff applied for both intermittent FMLA leave (her own condition) and continuous FMLA leave (to care for a family member). It was estimated that the Plaintiff would need to be gone for one time per week with an estimated one to two days of leave each time. The Plaintiff was approved by the Defendant for continuous FMLA leave from November 7, 2018

until December 10, 2018 and intermittent FMLA leave from October 22, 2018 until October 21, 2019. OSF's Benefits Help Center alerted Fisher of those approvals via email on December 5, 2018 and November 6, 2018, respectively. The Plaintiff only used ten total FMLA days and there were no days she wanted to use FMLA but was not able to, no days the Defendant denied a request for leave, and no days the Defendant instructed her to report to the office anyway. The Plaintiff used continuous FMLA leave on November 14-15, 20-21, and 26-30, 2018 and intermittent FMLA leave on April 5, 2019.[3]

In January 2019, the Plaintiff submitted her action plan for improvement stemming from her Tier 3 Mission Partner Survey results. She recalled during her deposition that the Pulse Survey – taken six months after the Mission Partner Opinion Survey – indicated categories that related to her stayed the same while others "went up," though "[t]hey wanted it to be more demonstratively in the right direction[.]" Dft's MSJ, Exh. A Wayland Dep. (Doc. 19-1 at pg. 33). On February 10, 2019, OSF received a second Integrity Line call in which the caller alleged the Plaintiff was aware of and refused to address bullying and intimidating behavior in IOL, continually made excuses, and failed to address issues in the working environment such that employees wanted to leave. On February 25, 2019, OSF received a third Integrity Line call stemming from the IOL in which the caller alleged there continued to be inappropriate and degrading treatment in that department. Fisher and Bond told the Plaintiff that something had to be done

---

[3] The Court notes that whereas Exhibit H attached to Bond's Affidavit details the Plaintiff's FMLA leave in late 2018, the documentation does not detail her FMLA leave in 2019. In her Affidavit, Bond stated, "Wayland used continuous FMLA leave November 14-15, 20-21, and 26-30, and intermitted FMLA leave on April 5 [ ]. Wayland did not report any additional days as FMLA leave days, was not charged for additional FMLA leave days, and was paid for all other days." Bond Aff. (Doc. 28-1 at pgs. 3-4). The Plaintiff stated generally in her Declaration that, "I was out for a good amount of time between December 2018 and April 2019 on my intermitted leave . . . In total I missed more than six weeks of work because of my FMLA leave." Wayland Declaration (Doc. 22-1 at pg. 16).

4

about the individual she supervised (and who was named in all three Integrity Line calls) and how the individual was being perceived in the IOL.  On April 16, 2019, OSF received a fourth Integrity Line call in which the caller stated, among other things, the "Department manager" (the Plaintiff) instilled an unhealthy, unfair work environment and further stated, "We are a Tier 3.  We have tried to get people to listen.  It's only getting worse."  Dft's MSJ, Bond Dep. Exh. 10 (Doc. 19-2 at pg. 79).  The Plaintiff agreed there "had been a few" Integrity Line calls and by then, the April call was "not the only one" as there had been one call before as well as one after the April 2019 call.  Every time an Integrity Line call came in, Fisher and someone from Human Resources met with the Plaintiff.

On April 25, 2019, after the MPOS, the Pulse Survey results, and the four Integrity Line calls, Fisher sent Bond a draft performance improvement plan for the Plaintiff.  On May 3, 2019, Fisher and Bond met with the Plaintiff and presented her with the document entitled "Performance Improvement Plan" (PIP).  Not all portions of the PIP were completed by the Plaintiff by the dates specified.[4]  On June 27, 2019, Fisher sent to Bond in Human Resources a summary of her concerns about the Plaintiff's performance deficiencies, and the decision to terminate the Plaintiff's employment with OSF was made on June 28, 2019.  On July 2, 2019, the Plaintiff was terminated.

## II

### A

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party has the burden of providing proper documentary

---

[4] The Plaintiff counters that everything was completed with the exception of items "it was impossible for her to complete."  *See* Plf's Resp. Wayland Declaration (Doc. 22-1 at pg. 15).

evidence to show the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323-24. Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). "[A] party moving for summary judgment can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993).

Accordingly, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there is a genuine triable issue; he "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 818 (7th Cir. 1999). However, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 250.

## B

### 1

The FMLA entitles an eligible employee to a total of 12 workweeks of leave during any 12-month period for several reasons, including: "In order to care for the spouse, or a son, daughter, or parent of the employee, if such spouse, son, daughter, or parent has a serious health condition;" and "Because of a serious health condition that makes the employee unable to perform the functions of the

position of such employee." 29 U.S.C. § 2612(a)(1)(C), (D). Employers are prohibited from both interfering with and retaliating against an employee's use or attempted use of FMLA leave. *Pagel v. TIN Inc.*, 695 F.3d 622, 626 (7th Cir. 2012) (citing 29 U.S.C. § 2615(a)(1), (2)). The Defendant contends that both theories fail as a matter of law in this case where there is no evidence that would permit a reasonable factfinder to conclude that the Plaintiff was placed on a PIP or terminated because she utilized leave under the FMLA. In her Response, the Plaintiff states that whether her claim is an interference claim or a retaliation claim is largely irrelevant because the ultimate question presented at summary judgment is whether a fact finder could reasonably conclude that had she not taken FMLA protected time off from work, her employment would not have been terminated.

**2**

To prevail on an interference claim, a plaintiff must establish: 1) she was eligible for the FMLA; 2) her employer was covered by the FMLA; 3) she was entitled to leave under the FMLA; 4) she provided notice of her intent to take leave; and 5) her employer denied her FMLA benefits to which she was entitled. *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1304 (7th Cir. 2022). Here, the Plaintiff concedes the parties do not dispute the first four elements, and the sole question is whether a jury could permissibly conclude that the Plaintiff's exercise of her rights under the FMLA caused her termination.[5]

The Defendant argues that there is no evidence OSF took issue with the Plaintiff's FMLA leave or otherwise commented on her absence, highlighting the

---

[5] In fact, the Plaintiff's argument with regard to her FMLA interference claim dovetails with the FMLA retaliation analysis in that the third and final element of the latter requires a showing of causation. *See King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017) (providing that to establish retaliation under the FMLA, a plaintiff must prove she engaged in protected activity, she suffered an adverse employment action, and a causal connection exists between the two).

fact that Wayland utilized FMLA leave and returned without change to position, title, or compensation. OSF points to the approximately six months that passed between the time Plaintiff took FMLA leave and her placement on the PIP as well as the absence of evidence tending to prove or even suggest that those PIP goals were outlandish or illegitimate. The Plaintiff counters that while her FMLA leave was approved, it was not respected because the Defendant held her to the same level of production (if not a higher level) as if she were not on a leave of absence. As for the PIP, the Plaintiff argues that it is relevant evidence because it was a condition precedent to her termination and itself seemed to have been set up to be impossible to complete. She says she was required to work harder, deliver more results, and dedicate more time despite the fact that she was also supposed to be on a protected leave of absence.

Fatally, the Plaintiff does not point to evidence of a nexus between her FMLA leave and her termination that would permit a reasonable jury to find in her favor. The Plaintiff relies heavily upon the sequence of events in this case, essentially arguing her FMLA leave must have been the sole reason for her termination where she received a "solid" rating from Fisher before her FMLA leave but nevertheless thereafter was found wanting in her job performance and received a PIP (as she puts it, the precursor to her termination). She contends the PIP imposed more aggressive goals for her to complete only after she requested and took FMLA leave. But her version glosses over several undisputed facts as to the timeline.

As an initial matter, the contents of the Integrity Line calls are not inadmissible hearsay.[6] The Defendant has clearly not offered the content of those calls for their truth, but rather to prove that it took its later actions to address the

---

[6] The Plaintiff only challenges two of the four Integrity Line calls.

8

Plaintiff's job performance for reasons *other than* that she was approved for and took FMLA leave. *See Boutros v. Avis Rent A Car System, LLC*, 802 F.3d 918, 324-25 (7th Cir. 2015) (finding individuals' out-of-court statements were presented not for their truth but as evidence of the defendant employer's reasons for suspending and then firing the plaintiff after an accident in which the plaintiff was involved); *Smith v. Wilson*, 705 F.3d 674, 679 (7th Cir. 2013) (explaining that testified-to rumors about the plaintiff were mischaracterized as hearsay where they were "offered not to prove the truth of the matter asserted [], but rather for the non-hearsay purpose of explaining [the defendant's] subsequent actions"). The IOL's poor MPOS results in August 2018 and an Integrity Line call in September 2018 in which the caller complained of the IOL and about the Plaintiff occurred *before* Wayland submitted her request for FMLA leave. After the Plaintiff submitted her action plan for improvement stemming from her Tier 3 MPOS results in January 2019, three additional Integrity Line calls were made regarding the IOL (two of those three complaining of the Plaintiff) between February and April 2019. After each call, Fisher and someone from Human Resources met with the Plaintiff. The early 2019 Pulse Survey results of the IOL did *not* show improvement in all regards. The Plaintiff took *no* FMLA leave between the time her PIP was given to her in May 2019 and when the Defendant decided to terminate her in late June 2019.

Even drawing all justifiable inferences in the Plaintiff's favor, the timing of her termination is not even suspect. *See, e.g., Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 827-28 (7th Cir. 2012) (finding district court properly entered summary judgment in the defendant's favor where the decision to terminate the plaintiff based on her failure to show any progress on her PIP was made two months after the plaintiff was granted an isolated leave request and before any additional requests were made). The facts are not that the Plaintiff went about her job in the absence of any particular attention being paid to that performance, requested and

took FMLA leave, and came back and was curiously terminated seemingly out of nowhere soon after availing herself of FMLA leave.  Instead, significantly, the department in which she was a manger received the lowest possible survey rating before she even requested FMLA leave and an Integrity Line call was received regarding the department in which she was a manager and regarding her before she even requested FMLA leave.  Integrity Line calls continued to be received regarding the IOL and specifically the Plaintiff *before* she was placed on a PIP.  The Defendant discussed the issues within the IOL with the Plaintiff over the course of several months before her termination.  Wayland was given the PIP in May but was not terminated until July, after certain items in the PIP were not completed by the dates specified.[7]  Moreover, Wayland did not take FMLA leave after her PIP was delivered to her.  She cannot say the Defendant punished her for taking FMLA leave where she did not actually take it and yet performance deficiencies persisted.

Timing alone does not create the nexus here, nor does the Plaintiff's bald assertion that the Defendant interfered with her protected leave by holding her to the same performance standards she would have been held to if she had not been on protected leave.  She cites evidence of factors beyond her control (others' job performance, a new hospital acquisition, implementation of new processes while she was absent) and fixates on her "solid" overall performance evaluation by Fisher for FY 2018 as proof that the Defendant had no reason beyond the Plaintiff's use of FMLA leave as the reason to find her performance fell short.  The Plaintiff argues that the Defendant has done nothing to establish the Tier 3 MPOS results

---

[7] The Plaintiff insists the only items not completed were those that a consultant and not the Plaintiff was working on.  That has no bearing on the fact that she was given the PIP several months remote from her continuous FMLA leave and nearly a month remote from her one day's intermittent FMLA leave.  She also fails to show such excuses were made contemporaneous with the Defendant's review of her performance pursuant to the PIP's stated goals.  The Plaintiff only cites her October 21, 2022 Declaration attached to her Response to the Defendant's Motion for Summary Judgment.

were the result of her poor leadership of the IOL, and there has been no evidence to demonstrate any type of documented coaching outlining concerns with her performance before she ever went on leave or before the PIP was implemented. She persists in failing to recognize that the evidence of problems within her department – the IOL – pre-dated her FMLA leave, continued while she was *not* on FMLA leave, and continued even after she submitted an action plan for improvement following the poor MPOS results. Put plainly, much of the evidence upon which the Plaintiff relies occurred independent of her FMLA leave.

The Defendant has cited undisputed evidence that the Plaintiff was subject to OSF disciplinary policies and performance standards both before and after she took FMLA leave. It has cited undisputed evidence of the sequence of events occurring over an eight-month period to show neither a causal connection existed between Wayland's FMLA leave and termination nor that she was denied benefits to which she was entitled. It remains *the Plaintiff's* burden, on summary judgment, to cite specific evidence showing that there is a genuine issue as to whether her termination was caused by her FMLA leave and/or that OSF interfered with her entitlement to take FMLA leave. Beside the fact that the Plaintiff took only one day of FMLA leave in 2019, even she could not connect the dots at her deposition:

Q. Can you tell me what your termination has to do with your FMLA leave?

A. The way I understand my termination is that I was terminated for inability to perform at a level that was expected and so – I mean I'm not a lawyer. So I don't know about FMLA, but I do know when you're on FMLA you have some kind of – if you're off I mean just by virtue of not being at the office or not being on the job, you certainly – your job needs to be protected from your inabilities in that regard.

Q. In terms of your job performance, let's go back to your performance improvement plan, Exhibit 4. Is there something

> on here that you were unable to do because you took FMLA leave?
>
> A. You know, I'm not sure I can answer it. Not sure I can quantify that and put it in terms of this specific day I was there . . . .
>
> * * *
>
> Q. How do you feel that your FMLA leave was used against you to impose the performance improvement plan?
>
> A. Because if I had not been off for a month in December or off intermittently throughout the second and third FYs, then it might have obviated the need for this.
>
> Q. I don't want to put words in your mouth, but I believe you told me earlier that you can't point to anything in the performance improvement plan that's directly related to your FMLA leave, is that correct?
>
> A. I think you just asked me to say how being on FMLA caused them to make a performance improvement plan for me, right?
>
> Q. Yes.
>
> A. Okay. And what I'm saying is that if my father hadn't died, if my mother didn't have Alzheimer's, if I didn't move her here, if I didn't need time off, if I didn't – you know, if I didn't have that time off and I had the requisite 60 to 80 hours to work at OSF, I maybe would have – I maybe would have been farther along than they wanted me to be when the news came in that we were – that Little Company of Mary was coming and that we needed to pivot.

Dft's MSJ, Exh. A Wayland Dep. (Doc. 19-1 at pgs. 40-41). In other words, Wayland herself was not even able to say with any certainty that her FMLA leave negatively affected her performance.

12

She also does not point to any evidence that she informed the Defendant or Fisher that her FMLA leave impacted her ability to perform her job. "The FMLA does not require an employer to adjust its performance standards for the time an employee is actually on the job, but it can require that performance standards be adjusted to avoid penalizing an employee for being absent during FMLA-protected leave." *Pagel*, 695 F.3d at 629. The Plaintiff avails herself of the latter statement, saying that while absent on FMLA leave she was, among other things, unable to keep up with her heavy workload, was unable to fully provide the vision and support her team was accustomed to for the goals and priorities of the new fiscal year, and was unable to communicate with her team and to those outside of her team in the fashion she normally did. The evidence belies her position. She was absent on FMLA leave just one day in 2019, and that one day was nearly one full month before she was placed on the PIP. The evidence thus overwhelmingly illustrates that the Defendant could not have penalized the Plaintiff for being absent while on FMLA leave. The Defendant is entitled to summary judgment.

### III

For the foregoing reasons, Defendant OSF Healthcare System's Motion for Summary Judgment (Doc. 19) is GRANTED. The Clerk is directed to terminate this case.

*It is so ordered.*

Entered on February 27, 2023.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE